## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 23-cr-160 (NEB/JFD) |
| Plaintiff, | |
| v. | **REPORT AND** |
| | **RECOMMENDATION** |
| CHRISTOPHER LEE WASHINGTON (31), | |
| Defendant. | |

---

This matter is before the Court on three dispositive motions filed by Defendant Christopher Lee Washington (Dkt. Nos. 1529, 1530, and 1532). Other motions filed by Mr. Washington were previously denied as untimely (Order, Dkt. No. 1569), while Mr. Washington's Motion to Sever (Dkt. No. 1528), like all motions to sever in this multi-defendant case, will be held in abeyance pending decisions on trial scheduling by the District Court Judge, the Honorable Nancy E. Brasel. The Court gave the United States the option of filing a response to Mr. Washington's three surviving motions by December 13, 2024. The United States chose not to do so, and on December 13, the Court took the motions under advisement.

A Second Superseding Indictment (Dkt. No. 820) was returned by the grand jury on March 6, 2024, charging Mr. Washington in Count I with Racketeering Conspiracy, in violation of 18 U.S.C. § 1962(d), and in Count III with Conspiring to Distribute Controlled Substances, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 846. Mr. Washington

1

now asks this Court to suppress evidence obtained in three searches and in statements Mr. Washington gave to law enforcement. The Court has before it Mr. Washington's motions; the two search warrants issued by Minnesota state court judge Mary R. Vasaly on August 24, 2023 as well as the applications (including supporting affidavit) for those warrants; the tracker warrant issued by Minnesota state court judge Michael Burns on July 18, 2023, as well as the application (including supporting affidavit) for that warrant; and two MP4 audio and video recordings, both of Mr. Washington's August 29, 2023 interview with Detective Jindra of the Brooklyn Park Police Department, but from different camera angles.

## I.    MOTIONS TO SUPPRESS EVIDENCE OBTAINED THROUGH SEARCH WARRANTS

Mr. Washington challenges three search warrants in two motions, asserting that each warrant was issued on the strength of an application affidavit that failed to show that probable cause existed to support the requested search warrant. The Court finds that the applications were all supported by a showing of probable cause and therefore recommends that both motions challenging search warrants be denied.

### 1.  Evidence Attributable to a July 28, 2023 Warrant Authorizing Placement of a Tracking Device on Mr. Washington's Car Should not be Suppressed.

#### a.  Detective Jindra's Affidavit in Support of an Application for a Tracking Warrant

On July 18, 2023, Detective Jackson Jindra of the Brooklyn Park Police Department, serving on the Hennepin County Sheriff's Office's Violent Offender Task Force, applied in state court for a warrant authorizing the placement and monitoring of an electronic

tracking device on a black 2014 Lincoln MKZ, further identified by its Minnesota license plate number, belonging to Mr. Washington.

In a sworn affidavit in support of his search warrant application, Detective Jindra stated that he learned from a Confidential Informant ("CI") that a man known to the CI as "Flock" was selling large amounts of "M box 30" fentanyl pills. No information about the CI's reliability is in the affidavit. Detective Jindra had investigated Mr. Washington previously and recognized the nickname "Flock" as belonging to Mr. Washington. Since the earlier investigation, Detective Jindra had monitored Mr. Washington's social media posts and had seen photographs of Mr. Washington displaying what Detective Jindra estimated to be $30,000 to $40,000, an amount Detective Jindra thought was indicative of narcotics dealing. The CI was shown a photograph, without any identifying information, of Mr. Washington and identified the person in the photograph as "Flock."

During Detective Jindra's earlier investigation, Mr. Washington lived in an apartment on Colfax Avenue South in Minneapolis. Detective Jindra went there, spoke to the property manager, and learned Mr. Washington still lived there and drove the black Lincoln MKZ with the specified Minnesota license plate number, a vehicle that Detective Jindra had seen Mr. Washington drive during the earlier investigation. When Detective Jindra ran the plate, he learned the vehicle was registered to Mr. Washington. Detective Jindra also knew from the earlier investigation that Mr. Washington's girlfriend drove a Chevrolet Impala with a known license plate number and that she parked in parking spot number 66 of the garage at the Colfax Avenue apartment building.

Building management gave Detective Jindra a key and permission to move freely about the building. After seeing both the Lincoln MKZ and the Impala in the garage, Detective Jindra arranged for the handler of a drug-sniffing police dog, "Zippo," to come to the garage with the dog. Detective Jindra stated that Zippo is certified by the North American Police Work Dog Association to detect marijuana, cocaine, crack cocaine, methamphetamine, MDMA, and heroin, but no information was provided about Zippo's ability to detect fentanyl. Zippo alerted to both the Lincoln MKZ and the Impala, while ignoring all the other vehicles parked in the garage.

### b. Analysis of Probable Cause

The Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend IV. "Issuance of a search warrant must be supported by probable cause, which depends on whether, under the totality of the circumstances, there is a fair probability evidence of a crime will be found in a particular place." *United States v. Faulkner,* 826 F.3d 1139, 1144 (8th Cir. 2016); *see* Fed. R. Crim. P. 41. "[P]robable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Illinois v. Gates*, 462 U.S. 213, 232 (1983). After a judicial officer has issued a warrant upon a finding of probable cause, that finding normally deserves great deference. *Id*. at 236.

When the issuing judge relies on the supporting affidavit to issue a search warrant, "only that information which is found within the four corners of the affidavit may be considered in determining the existence of probable cause." *United States v. Solomon*, 432 F.3d 824, 827 (8th Cir. 2005). "The affidavit should be examined under a common sense approach and not in a hypertechnical fashion." *Id.* (cleaned up); *accord United States v. Gladney*, 48 F.3d 309, 312 (8th Cir. 1995) ("Affidavits must be read in 'a common-sense and realistic fashion . . . .'"). Therefore, "[w]hen reviewing the issuance of a warrant, [this Court] afford[s] great deference to the issuing judge's probable-cause determination, ensuring only that the judge 'had a substantial basis for concluding that a search warrant would uncover evidence of wrongdoing.'" *United States v. Petruk*, 929 F.3d 952, 959 (8th Cir. 2019).

Under these legal standards, the Court finds that Detective Jindra's affidavit established probable cause for the placement of a tracking warrant on Mr. Washington's black Lincoln MKZ. Mr. Washington complains that the reliability of the CI was not established. While it is true that the information given in the affidavit about the CI's reliability is not extensive, it is nevertheless sufficient, particularly under the specific circumstances of this case.

"When an informant has provided reliable information in the past or where his tip was independently corroborated, a court may deem the informant's tip sufficiently reliable to support a probable cause determination." *United States v. Caswell*, 436 F.3d 894, 898 (8th Cir. 2006) (emphasis added). Under the independent-corroboration option, "[i]t is well

established that even the corroboration of minor, innocent details can suffice to establish probable cause." *Solomon*, 432 F.3d at 828 (cleaned up).

The information provided by the CI was not critical to a finding of probable cause. The CI did little more than tell Detective Jindra that a man known as "Flock" was selling fentanyl. Detective Jindra knew that "Flock" was a nickname for Mr. Washington and when Detective Jindra showed the CI a photograph of Mr. Washington, the CI identified the person in the photograph as "Flock." From that point on, all the information in the affidavit was generated by Detective Jindra, including Mr. Washington's address, the cars he and his girlfriend drove, the fact that Detective Jindra had investigated Mr. Washington before, and Mr. Washington's social media posts in which he displayed large sums of cash. Unlike *Caswell*, the Court here need not decide whether the CI was reliable enough to allow his/her information to "support" probable cause. The Court notes that the earlier investigation apparently did not lead to Mr. Washington being charged—if there were charges, that fact is not in the affidavit—and is therefore not placing great weight on the earlier investigation. But it still deserves, and receives, some weight, and in conjunction with the tip from the CI, the social media posts, and the Lincoln MKZ being registered to Mr. Washington, the information set forth in Detective Jindra's affidavit is sufficient to establish probable cause.

In connection with Detective Jindra's earlier investigation, Mr. Washington claims that the affidavit omits the salient fact that a search warrant conducted on Mr. Washington's apartment in that earlier investigation did not turn up any narcotics, and that the display of large sums of money on social media appears to be photographs taken at a casino, so their

6

incriminating nature is reduced because large sums of money are of course present at casinos.

The negative results of the earlier search of Mr. Washington's apartment have not moved Mr. Washington to request a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978) (a hearing at which a defendant may develop the record to support a challenge to a search warrant on the grounds that the supporting affidavit contains material omissions). Nor would such a request have been fruitful, since a court will deny a request for a *Franks* hearing if the search warrant, re-read with the omitted information supplied, still demonstrates probable cause to support the issuance of the search warrant. In this case, the exculpatory value of a search that did not turn up evidence of a crime is minimal. Inclusion of the negative results of the earlier search would not negate probable cause. A negative search warrant in the past does not negate a positive drug dog alert in the present. "Assuming that the dog is reliable, a dog sniff resulting in an alert on a container, car, or other item, *standing alone*, gives an officer probable cause to believe that there are drugs present." *United States v. Donnelly*, 475 F.3d 946, 955 (8th Cir. 2007) (emphasis added) (citing *United States v. Sundby*, 186 F.3d 873, 875–76 (8th Cir. 1999)). "To establish the dog's reliability, the affidavit need only state the dog has been trained and certified to detect drugs." *Sundby*, 186 F.3d at 876. These requirements were met in this case. While the affidavit does not say Zippo was certified to detect fentanyl, Detective Jindra's application for a tracker warrant states that there is probable cause to believe a tracker would develop evidence of narcotics trafficking generally, not fentanyl specifically. Under the governing law, the statement that Zippo was certified to detect illegal drugs was sufficient.

Mr. Washington's claim that when he displayed large amounts of cash he was in a casino similarly does not move the probable cause determination. Assuming this is true, it still needs to be borne in mind that if all the affidavit contained was Zippo's positive alert to the Lincoln MKZ, that alone would be enough under *Donnelly* and *Sundby*.

Mr. Washington challenges the dog sniff from another angle when he argues that Zippo should not have been in the garage because the landlord's consent was not enough to give the police legal, constitutional access to the garage either generally or specifically under Minnesota state caselaw. (Def.'s Mot. Suppress at 3, Dkt. No. 1529 (citing *State v. Licari*, 659 N.W. 2d 243, 251 (Minn. 2003).)

> Federal law, not state law, governs the admissibility of evidence in federal court.
>
> Because states may impose rules for arrests, searches, and seizures that are more restrictive than the Federal Constitution, state law violations do not necessarily offend the Federal Constitution . . . . Thus, when a federal court must decide whether to exclude evidence obtained through an arrest, search, or seizure by state officers, the appropriate inquiry is whether the arrest, search, or seizure violated the Federal Constitution, not whether the arrest, search, or seizure violated state law . . . . A federal court generally does not look to state statutes to assess the validity of an arrest, search, or seizure under the Fourth Amendment.

*United States v. Bell*, 54 F.3d 502, 503–04 (8th Cir. 1995); *see also Atwater v. City of Lago Vista*, 532 U.S. 318, 354–55 (2001) (handcuffing, transporting, and jailing of an individual as authorized by Texas law for violating a fine-only seatbelt ordinance did not violate the Fourth Amendment).

Applying federal law, the Court finds that the property manager's consent authorized Detective Jindra, Zippo, and Zippo's handler to be in the garage of Mr. Washington's apartment building. Because the parking garage was a common area of the

building, Mr. Washington did not have a reasonable expectation of privacy in the parking garage.

"Fourth Amendment rights are personal rights that may not be asserted vicariously." *United States v. Barragan*, 379 F.3d 524, 529 (8th Cir. 2004). A person "must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable." *Minnesota v. Carter*, 525 U.S. 83, 88 (1998). "If a defendant fails to prove a sufficiently close connection to the relevant places or objects searched he has no standing to claim that they were searched or seized illegally." *United States v. Gomez*, 16 F.3d 254, 256 (8th Cir. 1994). There is no "generalized expectation of privacy in the common areas of an apartment building." *United States v. McCaster*, 193 F.3d 930, 933 (8th Cir. 1999). The Eighth Circuit has held that a tenant does not have a legitimate expectation of privacy in common areas of an apartment building such as hallways and basements. *United States v. McGrane*, 746 F.2d 632, 634 (8th Cir. 1984) (basements); *United States v. Eisler*, 567 F.2d 814, 816 (8th Cir. 1977) (hallways). Whether law enforcement commits a trespass is not relevant. *Eisler*, 567 F.2d at 816.

Mr. Washington's motion does not show that he had a reasonable expectation of privacy in the parking garage. The garage was a common area of the building, accessible at least by other tenants who parked there. Mr. Washington has not shown that he had any ability to exclude others from the garage the way he would be able to exclude others from his own apartment. He did not have a reasonable expectation of privacy in the garage and therefore may not challenge law enforcement's entry into the garage.

### c. Even if the Application for a Tracker Warrant was Insufficient, the Good-Faith Exception of *United States v. Leon* Entitled Law Enforcement to Rely on a Judge's Decision to Issue the Warrant.

Even if the tracker warrant lacked probable cause the *Leon* good-faith exception applies. In *United States v. Leon*, the Supreme Court held that the exclusionary rule did not apply when the police obtain evidence by acting in "objectively reasonable reliance" on a search warrant. 468 U.S. 897, 922 (1984); *see also Herring v. United States*, 555 U.S. 135, 142 (2009) (quoting *Leon*, 468 U.S. at 922). The purpose of the exclusionary rule is to deter police misconduct, and where the police have relied, not on their own assessment of the evidence, but on the probable cause determination of a neutral and disinterested judge, there is no police misconduct, and thus, nothing that can be deterred through application of the exclusionary rule. *Herring*, 555 U.S. at 142; *Leon*, 468 U.S. at 916.

The *Leon* good-faith exception does not apply in the following four scenarios:

> (1) the supporting affidavit or testimony includes a false statement made knowingly and intentionally or with reckless disregard for the truth to mislead the issuing judge; (2) the issuing judge wholly abandoned his judicial role in issuing the warrant; (3) the affidavit in support of the warrant is so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; or (4) the warrant is so facially deficient that no police officer could reasonably presume the warrant to be valid.

*United States v. Ortiz-Cervantes*, 868 F.3d 695, 702–03 (8th Cir. 2017) (quoting *Leon*, 468 U.S. at 923) (cleaned up). Here, the supporting affidavit did not contain a false statement that was made knowingly and intentionally or with reckless disregard for the truth. There is nothing to indicate that the issuing judge abandoned his judicial role, nor was the affidavit so deficient in probable cause that belief in its existence was utterly unreasonable.

Finally, the face of the warrant was not itself deficient. Consequently, the exclusionary rule should not apply to evidence seized pursuant to the July 18, 2023 tracker warrant.

The Court recommends denying Mr. Washington's motion to suppress evidence gained through placement of a tracker warrant on Mr. Washington's Lincoln MKZ.

### 2. Evidence Seized Pursuant to two Search Warrants Issued on August 24, 2023 Should not be Suppressed.

On the morning of August 24, 2023, Detective Jindra applied for two more warrants. The applications are separated by only seven minutes, and the affidavits supporting the warrant applications are word-for-word identical, except that the earlier warrant application includes a sentence stating that Mr. Washington made frequent trips to a townhouse in Blaine (a sentence whose inclusion, in the Court's view, is immaterial because the sentence neither adds to, nor subtracts from, probable cause to search the places named in Detective Jindra's warrant application; the sentence would only matter if a warrant to search the Blaine townhouse were applied for).

In both applications, Detective Jindra sought to search for the same items, namely "M Box 30" fentanyl pills, firearms, evidence of gang affiliation, and other, related evidence. One application seeks a warrant to search (1) Mr. Washington's person; (2) the black 2014 Lincoln MKZ that was the subject of the July 18 tracker warrant; (3) a 2018 Chevrolet Impala, also further identified by its Minnesota license plate number; and (4) the apartment on Colfax Avenue South in Minneapolis where Mr. Washington lived. The other application seeks a warrant covering only Mr. Washington's person and the 2014 Lincoln MKZ. Because the places sought to be searched in one warrant application are a subset of

the places sought to be searched in the other warrant application, and because the supporting affidavits are identical but for one unimportant sentence, for efficiency's sake the Court analyzes both warrant applications together.

Detective Jindra added additional information from the CI in these two warrant applications. Instead of simply saying, as in the application for the tracker warrant, that the CI knew a man named "Flock" to be a seller of fentanyl, the applications averred that the CI knew both "Flock" and "Shakedown," and that "Shakedown" was "the shooter" for "Flock." Detective Jindra knew "Flock" to be Mr. Washington, and "Shakedown" to be co-defendant Ernest Ketter. Both Flock and Shakedown carried firearms that had been converted to fire on full automatic. Detective Jindra executed a search warrant at Mr. Ketter's apartment in September of 2022 and found a firearm that had been converted to fire on full automatic, 100 fentanyl pills, 12 grams of fentanyl in powder form, and a cell phone on which evidence of drug dealing was found. Other than noting that Mr. Washington carried a fully automatic firearm, all the additional information from the CI concerned Mr. Ketter.

Detective Jindra's affidavit then proceeds to recite all the information that was in his July 18 application for a tracker warrant, and adds information obtained through the tracker warrant. Detective Jindra observed that during July and early August of 2023 Mr. Washington made "many frequent short term stops at gas stations, apartment buildings and parking lots." Detective Jindra found this driving pattern "indicative of narcotics sales transactions." Detective Jindra also performed physical surveillance and saw both Mr.

Washington and Mr. Ketter conducting "what appeared to be drug deals based on your affiant's training and experience."

Detective Jindra also began receiving information from a confidential, reliable informant or "CRI." The CRI's reliability was established in the affidavit. Detective Jindra stated in his affidavit that "[t]his CRI has provided information to law enforcement many times in the past that has proven to be timely, reliable and has resulted in numerous prosecutions and convictions in state court." The CRI told Detective Jindra that Mr. Washington and Mr. Ketter were both large scale fentanyl dealers who "started the distribution network" (presumably for fentanyl) in Minneapolis and who supply the Highs with fentanyl.

Mr. Washington was also seen driving to and from a townhouse in Blaine that turned out to be the residence of Mr. Washington's brother's girlfriend. Mr. Washington went to the townhouse for 5–7 minutes at a time, and after he left, made frequent, short-term stops around the Twin Cities. Detectives arranged a trash pull from the townhouse, and when they went through the trash, they found a gallon size Ziploc bag that was coated with white powder residue on the inside. The residue tested positive for fentanyl.

Finally, physical surveillance on Mr. Washington showed him engaged in conduct consistent with selling drugs on three occasions on a single day. Each time, Mr. Washington left his Colfax Avenue apartment, went to another location, met someone there briefly, then returned to his apartment, where he stayed until he left again and met another person briefly at yet another location.

13

Applying the legal standards set out above in the discussion of the tracker warrant, Detective Jindra's affidavit establishes probable cause to search each of the places named in the warrant application:

- A drug dog positively alerted on the Lincoln MKZ, and Mr. Washington was seen driving the Lincoln when Mr. Washington went to what Detective Jindra, in his training and experience, believed to be drug transactions.

- Mr. Washington was seen leaving his apartment on Colfax Avenue three times in one day to make what appeared to Detective Jindra to be drug sales.

- A drug dog positively alerted on the Chevrolet Impala.

- Mr. Washington personally made what Detective Jindra believed to be drug sales. The Court finds that Mr. Washington's person is the place where one would reasonably expect to find smaller amounts of narcotics, cash from narcotics sales, and electronic devices.

As with the tracker warrant, even if these two warrant applications do not establish probable cause, the good-faith exception of *Leon v. United States* nevertheless prevents the exclusionary rule from being applied. There is no indication that any of the four situations in which *Leon* does not apply occurred in this case.

Mr. Washington asserts that the two warrants issued on August 24, 2023 are invalid for the same reasons he says the tracker warrant was invalid, that is, the reliability of the informant was not established, the fact that an earlier search warrant executed at Mr. Washington's apartment came up empty is omitted from the affidavit, Mr. Washington's display of cash took place in a casino, and Zippo should never have been in the garage. The

Court comes to the same conclusions that it did as to the tracker warrant, and for the same reasons.

The Court recommends that Mr. Washington's motion to suppress evidence found as a result of the two warrants issued on August 24, 2023 be denied.

## II.    MOTION TO SUPPRESS A STATEMENT

Mr. Washington moves to suppress his statement to Detective Jindra on August 29, 2023, on the grounds that Detective Jindra's statement "Right now, [the] feds want your ass, so I'm basically one of the only people that can keep them off of you if I can get some cooperation from you" was a promise or threat that made Mr. Washington's statement involuntary. The Court, having watched and listened to the audio and video recording of the statement, finds that Detective Jindra's statement had not the slightest effect on Mr. Washington, and recommends that the motion to suppress the statement be denied.

At the outset of the fifteen-minute interview, Detective Jindra read Mr. Washington his *Miranda* rights, followed immediately by the statement about "the feds" to which Mr. Washington particularly objects. At no time for the balance of the interview did Mr. Washington appear intimidated, or even concerned about his situation. At different times, he denied any involvement in the fentanyl trade, was scornful of the police, challenged them to show their evidence, and gave innocent explanations for the evidence against him: for example, that his short visits with other people were just Mr. Washington saying hi, or that the 800 fentanyl pills found on him at the time of his arrest were for personal use, or that his large amounts of cash were casino winnings.

15

Coerced confessions are forbidden because of the "strongly felt attitude of our society that important human values are sacrificed where an agency of the government, in the course of securing a conviction, wrings a confession out of an accused against his will," and because of "the deep-rooted feeling that the police must obey the law while enforcing the law; that in the end life and liberty can be as much endangered from illegal methods used to convict those thought to be criminals as from the actual criminals themselves." *Blackburn v. Alabama*, 361 U.S. 199, 206-207 (1960) (quoting *Spano v. New York,* 360 U.S. 315, 320-21 (1959)). A statement is voluntary when it is "the product of a rational intellect and a free will," *Blackburn*, 361 U.S. at 208, and it follows that a statement is involuntary when the subject's free will is overborne by governmental coercion, whether that coercion takes the form of physical intimidation or psychological pressure, *Townsend v. Sain*, 372 U.S. 293, 307 (1963); *Colorado v. Connelly*, 479 U.S. 157, 167 (1986) (requiring a showing of police coercion before a statement can be found involuntary; "[T]he Fifth Amendment privilege is not concerned 'with moral and psychological pressures to confess emanating from sources other than official coercion'") (quoting *Oregon v. Elstad*, 470 U.S. 298, 305 (1985)).

In addition, Mr. Washington received a *Miranda* warning, the adequacy of which the defense does not challenge. The Court has reviewed the entire interview tape, including the portion where Detective Jindra administers the *Miranda* warning. The Court finds the *Miranda* warning complete and adequate (*see* Gov't's Ex. 2 at 5). While Mr. Washington did not explicitly waive his rights, the Court finds that he implicitly waived his *Miranda* rights by speaking to law enforcement for fifteen minutes. "[C]ases in which a defendant

16

can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that the law enforcement authorities adhered to the dictates of *Miranda* are rare."[1] *Berkemer v. McCarty*, 468 U.S. 420, 433 n.20 (1984). This is not one of those cases.

As noted above, Mr. Washington's attitude throughout the short interview did not betray a trace of intimidation; indeed, Mr. Washington was unconcerned to the point of being scornful from beginning to end of the interview. Neither Detective Jindra nor the other officer in the room raised their voices, pounded the table, or engaged in any other threatening behavior. Nor can the statement of Detective Jindra that Mr. Washington challenges be construed as a threat or a promise. It is an accurate statement of Mr. Washington's legal situation. Even if what Detective Jindra said could be construed as a promise or a threat, it was insufficient to overcome Mr. Washington's will and get him to speak. A fifteen-minute interview is not long enough to wear a subject down, and Mr. Washington, as he stated at the outset of the interview, had past experience with the criminal justice system.

The Court recommends that Mr. Washington's motion to suppress his statement be denied.

---

[1] This raises the question whether *Miranda* was, in fact, "adhered to" given that the police did not ask Mr. Washington whether he understood his rights and Mr. Washington did not explicitly waive his *Miranda* rights before police questioning commenced. Any waiver would have to be implicit, based on his answering questions after being advised of his rights. Mr. Washington has not challenged the adequacy of his *Miranda* waiver, but if he had, the Court would have found that he implicitly waived his rights. *United States v. House*, 939 F.2d 659, 662 (8th Cir. 1991) ("[W]aiver may be inferred from the fact that the defendant responded to questions posed by the interviewer after being advised of his rights").

Accordingly, **IT IS HEREBY RECOMMENDED** that:

1. Mr. Washington's Motion to Suppress Evidence Obtained Pursuant to the two Search Warrants Issued on August 24, 2023 (Dkt. No. 1529) be **DENIED**;

2. Mr. Washington's Motion to Suppress Evidence Obtained Pursuant to a Tracker Warrant Issued on July 18, 2023 (Dkt. No. 1530) be **DENIED**; and

3. Mr. Washington's Motion to Suppress his Statement (Dkt. No. 1532) be **DENIED**.


Date:  January 13, 2025                    *s/  John F. Docherty*
                                           JOHN F. DOCHERTY
                                           United States Magistrate Judge

### NOTICE

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals. Under LR 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. D. Minn. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in LR 72.2(c).